SPRINGFIELD CITY WATER COMPANY, a Corporation, Appellant, v. THE CITY OF SPRINGFIELD, MISSOURI, a Municipal Corporation, and HERSCHEL E. BENNETT, Commissioner of Revenue for said City. —No. 39038.—182 S. W. (2d) 613.

Division Two, Octobr 9, 1944.

446

*Neale, Newman & Wampler* and *W. D. Tatlow* for appellant.

*Alfred Page, Theodore Beezley, W. L. Vandeventer* and *J. Weston Miller* for respondents.

450

ELLISON, J.—The appellant Springfield City Water Company by its petition in equity sought in the lower court permanently to enjoin the enforcement of General Ordinance No. 301 of the respondent City of Springfield, adopted September 30, 1943, and levying an occupation tax of 5% on its gross receipts. The petition charges the ordinance is discriminatory, arbitrary and void under Sec. 3, Art. X of the State Constitution, which requires taxes to be uniform upon the same class of subjects within the taxing area. There is a further contention that the ordinance violates Sec. 7442.[1] Under that statute the ordinances of all cities must conform to the state law upon the same subject. The theory of the contention is that the 5% occupation tax levied by the ordinance falls in the same category as the State sales tax; and that Sec. 11408 limits the latter to 2%. The circuit court sustained a demurrer to the petition on the ground that it fails to state a cause of action. Appellant refused to plead further, whereupon the trial court dismissed the suit. The sufficiency of the petition is the sole issue on this appeal.

Considering first the charge of discrimination. The ordinance levies the tax on the business of every person (including corporations) engaged in supplying water for compensation through pipes laid in the streets, alleys, parkways or other publicly owned premises of the City. The appellant's annual gross receipts are $500,000 making its tax $25,000 per year. The gross receipts by which the tax is gauged seemingly are those from all sales of water conveyed through any of its pipe lines in the city, whether delivered and consumed within or without the city. There are other utilities in Springfield upon which occupation taxes are levied in different amounts by different ordinances. The tax against the Western Union Telegraph Company is $100 per year; and that against the Railway Express Company only $50 per year. The Springfield Gas and Electric Company through a subsidiary operates bus lines on which the annual tax is $50 per bus. All these taxes are much less than appellant's. The tax against the last named Company for gas and electric service is 5%, the same as

[1]All sections of our statutes cited herein appear in R. S. Mo., 1939, and same section numbers in Mo. R. S. A., unless otherwise shown. Italics in quotations are ours.

appellant's, but those ordinances have been interpreted by resolution of the City Council to cover only gross receipts from business within the city. Some utilities, such as refrigerating companies, pay no tax at all.

All these taxing ordinances are based on subsection XVII of Sec. 6609, in the statutory charter of cities of the second class, to which the City of Springfield belongs. It authorizes such cities "to *license and tax* telegraph companies, telephone companies, electric companies, street railway companies, gas companies, subway companies, conduit companies, heating companies, lighting companies, express companies, refrigerating companies, water companies and utilities of whatsoever name or character, like or unlike." Twelve utility businesses are specifically named. There is no express ▆▆▆ authorization in the subsection for a sub-classification of these utilities for the purposes of taxation.

The next subsection in the statute, subsection XVIII, groups over 200 businesses and callings of various natures, and provides they may be licensed, taxed *and regulated*. Utilities, as such, are omitted from that subsection but it does include the "poles and wires, or conduits and wires, of telegraph, telephone, electric light, street railway and electric and power companies" (five kinds of utilities). And near the end there is a provision authorizing the city "to divide the various occupations, professions, trades, pursuits, corporations . . . into different classes." Subsection XIX provides certain other designated businesses, which are more questionable, may be "licensed, regulated, taxed *or suppressed.*" There is no clause in that subsection either, permitting sub-classification—though appellant concedes it may be done.

The statutory charter of second class cities, in which Sec. 6609 and the foregoing three subdivisions thereof appear, was enacted by Laws Mo., 1913, pp. 420, 428-430. Subsection XVII then was the same as now, except that "water companies" were not included. Those words were inserted by Laws Mo., 1933, pp. 296, 298, but apparently unintentionally omitted by Laws 1933, pp. 310, 312, and then reinserted by Laws Mo., 1939, pp. 523, 525. At any rate, the Act was originally adopted in 1913 during the same 47th Session of the General Assembly at which the public service commission law was first enacted. Laws Mo., 1913, pp. 556, 561. That Act confided to the Public Service Commission the exclusive power to reglate the same twelve utilities enumerated in subsection XVII (see now Sec's 5578, 5592) with respect to capitalization, operation, rates, public necessity and the like.

So much for the contents of the statutes. Appellant contends that subsection XVII of Sec. 6609, supra, groups the twelve utilities there named in a *single* class for the purpose of licensing and taxation regardless of their nature—this last especially in view of the catchall phrase at the end of the subsection ("and utilities of whatsoever

name or character, like or unlike.'') Thence it is argued that under Sec. 3, Art. X of the Constitution any tax levied must be uniform against every member of the class, or else no tax can be imposed. It is further asserted that the inclusion of these same twelve utilities in the public service commission law at the same legislative session for the purpose of regulation, confirms the above view by showing a fixed intention to treat them as a class. And finally appellant maintains his argument is clinched by the facts that subsection XVII contains no clause authorizing sub-classification of the twelve utilities for the purposes of licensing and taxation, whereas subsection XVIII expressly authorizes it for the purpose of licensing, taxing and *regulating* the 200 odd businesses there enumerated, which last is not a taxing power but a police power.

In other words, appellant thinks the maxim *expressio unius est exclusio alterius* resolves all doubts about the case—if there is any doubt. In explaining its concession that the maxim does not apply to subsection XIX which, also, lacks a sub-classification clause, appellant says the businesses, acts and things there named are so questionable as to be subject to *suppression*—a drastic power that obviously may call for separate treatment of the things suppressed according to their nature, whether expressly authorized or not.

Respondents maintain to the contrary that subsection XVII, standing alone, allows second class cities to subdivide the twelve utilities there named into classes and to levy a different tax on each, or none at all, in view of the fact that the subsection does not forbid it, and of the difference in the respective natures of the utilities. They further maintain that when the three subsections are construed together, and their history is reviewed in connection with the public service commission law, the same conclusion must be reached, forbidding the application of the maxim *expressio unius*, etc. We take up these points in order, confining ourselves to mere construction and historical review of the statutes for the present, and reserving our discussion of the precedents until later.

With respect to the difference in the natures of the twelve utilities named in subsection XVII respondents point out the following. A water company supplies a commodity necessary to human existence and fire prevention, digs up the streets extensively, and occupies them with its pipe lines and hydrants. So also of gas, subway, conduit, heating, electric and telephone companies—though in diminishing [616] degrees as to the extent or character of physical encroachment on the streets, and with some difference in the vital need of their services throughout periods of depression and prosperity alike. On the other hand, a telegraph company would occupy the streets only to a limited extent; and an express or bus company would make only traffic use thereof the same as other vehicles. A refrigerating company might be conducted wholly on the premises of the owner. There

are some businesses, not specified in the subsection, of which the same would be true. Trucking companies would merely travel the streets; and warehouse and elevator companies would not use them at all. (We are not holding one way or the other on whether these unnamed companies come within subsec. XVII, under the rule of *ejusdem generis*.) The income from several of these enterprises is derived in large part from outside or even interstate business. Some of the utilities would ordinarily enjoy freedom from competition; some would not.

In arguing that a construction of the three subsections together, and in connection with the public service commission law, does not justify the application of the maxim *expressio unius*, etc., it may be pointed out that subsection XVIII as it stands now does not wholly exclude the classification of utilities. This is because it still contains the clause permitting the licensing, taxation and regulation of posts, wires and conduits of the five utilities mentioned in the sixth preceding paragraph, and makes the classification provision near the end of the subsection applicable to them. But appellant's main contention is based on the legislative history of Sec. 6609 and its three subsections, supra, as drawn chiefly from the Senate Journal of the 47th General Assembly, pp. 782-3, and the original bill for the second class city Act of 1913.

The predecessor statute of Sec. 6609 was Sec. 8890, R. S. 1909. The only utilities named therein were telegraph companies and "street railroad cars." Second class cities were permitted to license, tax and regulate them. In 1913 the original bill for the new second class city Act was House Bill 148. Section 8, subsection "eighteenth" thereof greaty expanded the predecessor statute and included the twelve utilities heretofore frequently mentioned (except water companies), still providing they should be licensed, taxed and *regulated*. It also contained the provision about the poles, wires and conduits of the five utilities. Furthermore there was a subsection "ninth" in Sec. 8 permitting the cities to regulate the construction, operation, service and rates of utilities under franchise; and a subsection "seventeenth" dealing with the antequated subject of wharves, harbors, and ferries.

When the House Bill reached the Senate where the new public service commission bill was pending, the Senate amended the House Bill by striking out subsections "ninth" and "seventeenth" thereof; and took out of subsection "eighteenth" the part naming the twelve utilities. These utilities were transferred to a new subsection "seventeenth" to be licensed and taxed *only,* this being the present subsection XVII of Sec. 6609. Respondents assert the obvious and sole purpose of the Senate in making these amendments (except as to wharves, etc.) was to eliminate all provisions from House Bill 148 which would have permitted second class cities to compete with the Public Service Commission in regulating utilities; and that it had nothing to do with sub-classification. We think the warrantable in-

ferences and logical deductions to be drawn from the above history tend to support respondents' theory, and turn now to the precedents cited by the parties.

Appellant relies on State ex rel. Ashby v. Cairo Bridge & Termn. Co., 340 Mo. 190, 197(4), 100 S. W. (2d) 441, 444 (5-6) as a direct authority showing by analogy that the twelve utilities named in subsection XVII constitute a single class. The defendant bridge company in that case was sued for daily penalties for failure to report its taxable property to the State Tax Commission as required by Sec. 10066, Laws Mo., 1933, p. 422. That statute named ten kinds of utilities to which it was applicable. But the penalty for failure to comply therewith was imposed by another statute, Sec. 10070, R. S. Mo. 1929, Mo., R. S. A., p. 8059, which named only four of those ten utilities, of which the defendant bridge company was one. It challenged the constitutionality of Sec. 10070 on the ground that it denied equal protection of the law and was special legislation. This court upheld that contention saying the ten utilities named in Sec. 10066 constituted a single class, whereas Sec. 10070 exacted the penalty from only four of them and thereby exempted the other six.

We find no fault with the decision but it is not in point. Undoubtedly all ten utilities there named were in the same class, in the sense that all were bound to do the same act, namely to make the tax reports. The statute expressly required it. But that throws no light on the question whether subsection XVII of Sec. 6609 here should be construed to permit sub-classification for taxation. That statute is merely permissive and is silent on the matter of classification.

Another case cited by appellant is Davies Warehouse Co. v. Bowles, 321 U. S. 144, 88 L. Ed. 379, 382, 386, 64 S. Ct. 474, 478(1, 2), 481 (14). There, the Emergency Price Control Act authorized the Federal Price Administrator to regulate the prices charged for commodities, but contained a proviso that it should not be construed to apply to rates charged by any common carrier "or other public utility." The word utility was not defined. The question was whether the exemption was limited to a fixed class of businesses "traditionally regarded as utilities" everywhere throughout the United States; or to businesses classified by the various state laws as utilities and regulated as such.

The decision held the latter, thus permitting the several states to fix the inclusive limits of the general class of "public utilities" established by the Price Control Act. But we are unable to see that the case helps appellant. Of course the instant subsection XVII does fix one general permissive class of twelve named utilities which are *subject* to licensing and taxation. But the question here is whether the statute allows the general class to be sub-classified. To some extent the Davies case rather supports respondents' affirmative contention

on, that point, for it holds the class designated by the words "public utilities" was *not* fixed and unvarying.

Looking to the decisions cited by respondents. We think it clear under Sec. 3, Art. X of the State Constitution that a City has the power to sub-classify by ordinance the subjects of taxation enumerated in a general taxing statute if there is a reasonable basis for doing it and nothing in the statute forbids. Village of Beverly Hills v. Schulter, 344 Mo. 1098, 1103(3), 130 S. W. (2d) 532, 535(5, 6). This is true notwithstanding some city charters go further and expressly sanction sub-classification. Edmonds v. City of St. Louis, 348 Mo. 1063, 1072-3, 156 S. W. (2d) 619, 624-5.

Both parties rely on N. Y. Rapid Transit Co. v. New York, 303 U. S. 573, 578, 87 L. Ed. 1024, 58 S. Ct. 721, which upheld an ordinance levying a similar tax on utilities in New York City for the benefit of unemployment. Respondents cite the case for the pronouncements therein concerning the broad discretion possessed by the taxing power in classifying the subjects of taxation. Appellant invokes it because the New York ordinance apparently included all of the twelve kinds of utilities named in the instant subsection XVII, and none other; and united them in a single class.

The decision plainly holds such a unit class may be created. But we do not regard it as authority that the cities cannot subdivide the class, for two reasons. First, the New York ordinance provided *every* designated utility *shall* pay the tax and fixed the amount. In this case, Sec. 6609 and subsection XVII merely *empower* the cities to levy *a* tax upon the twelve utilities in the class. It is a permissive power and, as stated by respondents, the members of the class differ characteristically in some respects. Secondly, the New York ordinance was municipal legislation dealing with the particular city. Here, we have a statute applicable to all second class cities in the state. It can hardly be thought that subsection XVII means every such city *must* tax the twelve named utilities alike, or not at all, regardless of characteristics and local conditions. The latter (state as against national conditions) were treated as controlling in the Davies Warehouse case, supra. See also 37 C. J., sec. 22, p. 180, sec. 22, p. 198, sec. 55, p. 205. We hold subsection XVII standing alone does not on its face require the twelve utilities to be taxed as a single class.

The next question is whether the maxim *expressio unius est exclusio alterius* should be applied. The decision stressed by appellant in invoking the maxim is City of St. Louis v. Boatmen's Ins. & Trust Co., 47 Mo. 150, 154. The defendant insurance company there was prosecuted for failure to take out a city license, as required by ordinance. One defense was that the ordinance levied a tax for revenue in the guise of a license fee, in violation of the ▮ City's charter, Laws Mo. 1867, pp. 56, 65, sec. 1, subsec. 45. That subsection only authorized the city "to license all insurance companies,"

and did not specify any power of taxation. The decision held the right to license alone ordinarily does not imply the right to tax. Then it proceeded to interpret the charter, pointing out that subsection 45, supra, merely permitted the city to license insurance companies, whereas four preceding subsections expressly authorized it to license, *tax*, regulate, and in some instances suppress, certain other businesses. This, said the opinion, "abundantly show(s) that the mind of the lawgiver was directed to the subject, and that the power to tax was given where it was intended to be exercised, and that it was withheld where it was not so expressed."

We are also referred to two other cases which applied the maxim *expressio unius*, etc., in the construction of taxing statutes. They are Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 930(7), 87 S. W. (2d) 195, 205(13), and Kroger Groc. & Baking Co. v. St. Louis, 341 Mo. 62, 73, 106 S. W. (2d) 435, 439(5-7), 111 A. L. R. 589. Both held the maxim applicable to language in a statute specifying the method of *exercising* powers (the question here) as well as language *granting* powers (the question in the Boatmen's Insurance case, supra). There is no doubt about that.

But all the authorities agree that the maxim is a mere auxiliary rule of construction on aid of the fundamental objective, which is to ascertain the intention of the lawmakers; and that it must be applied with caution.[2] It is stated in 50 American Jurisprudence, just cited in the margin, on authority of the Kansas case, also cited, which quotes 25 R. C. L. 1077, that the application of the maxim "should produce a rational interpretation, and support a policy which may be *reasonably supposed to have dictated the enactment*." And the same text notes the declaration of the United States Supreme Court in Ford v. United States, likewise cited below, that the maxim may properly be invoked "only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces *the affirmative inference* that that which is omitted must be intended to have opposite and contrary treatment."

The language of the decisions varies. One case says the maxim should not be applied *if it clearly appears* such was not the legislative intent, thus putting the burden on him who protests against its use. Collins v. Russell, 114 Fed. (2d) 334, 337(1). Another declares it applicable where there is *nothing to indicate* a contrary intention. State ex rel. Donahue v. Bd. of Trustees, 211 Ind. 643, 647, 7 N. E.

---

[2] 2 Sutherland, Statutory Construction (3 Ed.), sec. 4917, p. 418; 59 C. J., sec. 582, p. 984; 50 Am. Jur., sec. 245, p. 240, citing State ex rel. O'Bannon v. Cole, 220 Mo. 697, 712(3), 119 S. W. 424, 428(3), 22 L. R. A. (N. S.) 986; Commerce Trust Co. v. Paulen, 126 Kan. 777, 780, 271 Pac. 388, 389(2), 63 A. L. R. 384, 387; Ford v. United States, 273 U. S. 593, 611, 71 L. Ed. 793, 47 S. Ct. 531.

(2d) 196, 198(3). But of some twenty cases decided within the last seven years (with which we shall not burden this opinion) the great majority hold the maxim is simply an aid to construction, to be used cautiously in seeking the lawmakers' intention, and not as a formula to be arbitrarily applied. Three comparable cases in which it was rejected in construing legislation having two or more sections, one containing matter left out of the other, as here, are cited in the margin.[3] We quote the decision which seems most applicable to the present facts, Robb v. Ramey Associates (Del. Sup. Ct.), 14 Atl. (2d) 394, 396 (5, 6) omitting the authorities cited:

"The maxim, like all rules of construction, is applicable under certain conditions to determine the intention of the lawmaking body when it is not otherwise clear; but it should never be permitted to defeat the plainly indicated purpose of the legislature. . . . Great caution is required in the application of the maxim. . . . It is not a rule of universal application, but is to be applied only as an aid in arriving at intention, and not to defeat the apparent intention. . . . Considerations of injustice, unreasonableness or absurdity are not to be ignored. The mention of one thing is not to be held exclusive when the context shows a different intention; . . ."

In our opinion subsection XVII of Sec. 6609, supra, may well be interpreted to create a general class subject to licensing and taxation, without any annexed condition that all members shall be taxed alike. Certainly no such condition is stated. They would therefore be subject to reasonable sub-classification, according to their respective natures. Injustice might otherwise result as to some for the reasons heretofore stated. And the fact that subsection XVII contains no express authorization for such classification whereas subsection XVIII does, is not persuasive that the power was withheld as to the twelve utilities named in the former subjection—when the history of the legislation is considered. This assignment is overruled.

The next assignment is that the 5% tax levied by Ordinance 301 violates Sec. 7442, which requires city ordinances to conform to state law on the same subject. The theory is that the ordinance tax falls in the same category as the state sales tax, being in effect a tax on the gross sales of the utility, which make up its gross receipts; and that the sales tax is limited by Sec. 11408 to 2% on each retail sale. In other words the ordinance tax exceeds the sales tax and therefore contravenes Sec. 7442, supra.

Appellant cites International Harvester Co. v. Dept. of Treasury of Indiana, 322 U. S. 340, 88 L. Ed. 905, 909, 64 S. Ct. 1019, 1022(4). That case dealt with an Indiana gross income tax which covered sales in the state to purchasers outside and vice versa. It was contended

[3]State ex rel. Curtis v. DeCorps, 134 Ohio St. 295, 298, 16 N. E. (2d) 459, 461; Industrial Trust Co. v. Goldman, 59 R. I. 11, 18, 193 Atl. 852, 855(3); American Imp. Co. v. U. S., 26 U. S. Ct. & Patent App. 116, 118.

458

this invaded the field of interstate commerce. In determining the applicability of certain earlier decisions of the United States Supreme Court which dealt with taxes ''of different names'' but which the court found to be substantially similar in incidence and effect, the opinion said, ''We are dealing in this field with matters of substance not with dialectics.'' Appellant insists we should do the same here.

The question has already been ruled twice by this court. In Ploch v. City of St. Louis, 345 Mo. 1069, 1077(3), 138 S. W. (2d) 1020, 1024(8), decided in 1940, this court en banc held that the state sales tax is not the same as a municipal license or occupation tax payable by the seller, and does not foreclose the right of municipalities to levy such taxes. The two sections of the Sales Tax Act construed in the Ploch case were Secs. 47, 48, Laws Mo. 1937, p. 568, now Sec's 11454 and 11455. Appellant says the cigarette tax involved in that case was a regulatory measure enacted in the exercise of the police power, which is broader than the mere power to tax. We are asked to distinguish it on that ground. But the Legislature has left the above statutes unchanged since the Ploch case was decided, Laws Mo. 1941, p. 713; Laws Mo. 1943, p. 1029. And less than four months ago the Ploch case was followed and reaffirmed by Division I in a case where the tax was the same as here, a license tax of 5% on the gross receipts of an electric utility. Union Electric Co. v. City of St. Charles, 352 Mo. 1194, 181 S. W. (2d) 526, 529(8). On authority of these two decisions the assignment must be overruled.

This, and the ruling already made on the first assignment, result in the affirmance of the judgment below. All concur.